SINGER / BEA LLP
Benjamin L. Singer (Bar. No. 264295)
bsinger@singerbea.com
Katie K. Erno (Bar No. 264748)
kerno@singerbea.com
601 Montgomery Street, Suite 1950
San Francisco, CA 94111
Telephone: (415) 500-6080
Facsimile: (415) 500-6080

Attorneys for Creative Mobile Technologies, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CREATIVE MOBILE TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FLYWHEEL SOFTWARE, INC.,<br><br>Defendant. | CASE NO. _____<br><br>**COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(3) INDUCING BREACH OF CONTRACT;**<br>**(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND**<br>**(5) UNFAIR COMPETITION (CAL. BUS. PROF. CODE SECTION 17200 ET SEQ.)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Creative Mobile Technologies, LLC ("CMT" or "Plaintiff"), for its complaint against Flywheel Software, Inc. ("Flywheel" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. On or around December 4, 2014, CMT and Flywheel entered into a contract designed to remedy Flywheel's repeated interference with CMT's contracts with third party taxicab fleets. This action arises out of Flywheel's flagrant breach of that contract and continued, increasing tortious interference. Almost immediately after signing a contract with CMT, Flywheel began breaching its obligations by █████████████████████████████████████████████████████████████████████████████████████████████████████. Not only is Flywheel breaching its own agreement with CMT, it is also intentionally interfering with, and inducing breach of, CMT's existing contracts with taxi fleets all around the country by prompting them to also divert electronic payments to Flywheel, despite such taxi fleets having similar exclusivity agreements with CMT in place. Flywheel's motives are simple: after negotiating a business solution that protected CMT's existing contracts but allowed Flywheel to continue marketing its mobile hailing application to taxicabs, Flywheel apparently decided it would be more advantageous to cast its contract with CMT aside and appropriate CMT's customers for itself. Flywheel continues to breach its contract with CMT on a daily basis and induce numerous third party taxi fleets to do the same, with each diverted transaction causing CMT further loss. Because Flywheel has so blatantly disregarded the Parties' current contract—which was itself an attempt to remedy Flywheel's tortious interference—CMT has no recourse other than to seek relief from the Court.

## PARTIES

2.  Plaintiff CMT is a New York limited liability company, with its principal place of business at 42-50 24th Street, Long Island City, NY 11101.  CMT supplies taxicabs with in-vehicle payment, passenger information, and advertising platform mobile hardware solutions nationwide ("CMT Hardware"), as well as related software programs to operate the hardware.  These products enable passengers to, *inter alia*, (i) receive information about their ride and view local city announcements, promotional videos, content and advertisements during their trip via CMT's passenger information monitor ("PIM") in the backseat of the car, and (ii) pay for their ride by swiping their credit card in the point-of-sale device installed in the backseat.

3.  Upon information and belief, Defendant Flywheel is a Delaware corporation with its principal place of business at 816 Hamilton Street, Redwood City, CA 94063.  Flywheel is an e-hail application provider.  Flywheel developed an application that allows passengers to "hail" taxicabs using their smartphones.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§1332 because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.

5.  This Court has personal jurisdiction over Defendant, as Defendant's principal place of business is in this State, Defendant conducts substantial business in this State and District, and a substantial portion of the wrongful conduct alleged herein took place in this State and District.

6.  Venue is proper under 28 U.S.C. §1391 in that a substantial part of the events that gave rise to this cause of action occurred in this District, and Defendant is also subject to personal jurisdiction in this District.

## INTRADISTRICT ASSIGNMENT

7. Assignment to the San Francisco Division is proper under Civil Local Rule 3-2 because a substantial part of the events which give rise to this action occurred in the city and county of San Francisco.

## FACTUAL BACKGROUND

### CMT Develops In-Vehicle Technology Tailored To Government Regulations

8. Between approximately 2011 and 2013, the San Francisco Mass Transit Authority ("SFMTA") issued a series of regulations for San Francisco taxi fleets, requiring them to, *inter alia*, install backseat credit card payment terminals and PIMs accessible to the blind in all taxicabs. As part of those regulations, taxi fleet operators were required to retain third party payment service providers (like CMT) to handle all aspects of electronic payment transactions and trip data collection and reporting. Similar regulations for PIMs and in-vehicle debit and credit card payment processing have been issued in the other major metropolitan areas CMT serves.

9. In response to these regulations, CMT invested millions of dollars designing and developing compliant technology, and then contracted with numerous taxi fleets nationwide, including the major taxi fleets in San Francisco, New York, Boston, Philadelphia, Chicago, and Houston (together, the "Taxi Fleet Partners"), to install the CMT Hardware in their taxicabs. These contracts provide that CMT will purchase and install the CMT Hardware, at no upfront cost to the Taxi Fleet Partners, for use by the Taxi Fleet Partner members (*i.e.,* taxicab drivers), and—in doing so—ensure that the drivers are complying with local and state taxi regulations. In exchange, the Taxi Fleet Partners agreed, *inter alia*, to process all electronic passenger payments exclusively through CMT's payment processor throughout the duration of the contract. In most cases, CMT collects a processing fee for these transactions.

10. The contract terms range from five to ten years in duration, depending on the fleet and market. All contracts with the Taxi Fleet Partners are active.

11. These exclusivity and duration terms were and remain critical to CMT. The cost to CMT in developing and installing compliant in-vehicle equipment is enormous. The CMT Hardware has a value of $2,605.00 per vehicle. With each of its Taxi Fleet Partners having hundreds of members, CMT has easily invested upwards of $25 million dollars in these products and services. CMT recoups its investment largely through the electronic payment transaction fees it collects as the Taxi Fleet Partners' exclusive electronic payment processor. CMT has already suffered significant losses due to Flywheel's breach and tortious interference. If CMT's contractual rights are not respected, CMT stands to lose millions more.

12. Currently, in San Francisco, CMT has existing contracts with Luxor Cabs, Inc. ("Luxor"), Royal Taxi, Inc., d/b/a/ Citywide Taxi Dispatch ("Citywide"), San Francisco Taxi Dispatch, Inc. ("SF Taxi"), and Comfort Cab. In New York, CMT has existing contracts with 28th Street Management, Inc., Downtown Taxi Management, LLC, Tunnel Taxi Management, LLC, and Woodside Management, Inc. In Boston, CMT has an existing contract with Boston Cab Dispatch, Inc. In Chicago, CMT has an existing contract with Dispatch Taxi Affiliation, Inc. and Northwest Management, LLC. In Philadelphia, CMT has an existing contract with Philadelphia Taxi Management, LLC. In Houston, CMT has an existing contract with Taxis of Houston. CMT has similar contracts with fleets in nearly eighty (80) other cities across the United States.

**The CMT-Flywheel Contract**

13. On or around December 4, 2014, ███████████████████████████████████████████████████████████████████

- 4 -
COMPLAINT FOR:(1) BREACH OF CONTRACT;(2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;(3) INDUCING BREACH OF CONTRACT;(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND (5)UNFAIR COMPETITION (CAL. BUS. PROF. CODE SECTION 17200 ET SEQ.)DEMAND FOR JURY TRIAL
CASE NO.

1  ████████████████████████████████████████ (the "CMT-Flywheel
2  Contract"). ████████████████████████████████████████████
3  ████████████████████████████████████████████████████████
4  ████████████████████████████████████████████████
5  ████████████████████.

6  14.  Up until the past few years, there were two ways in which passengers could "hail" a taxicab—on the street or by telephoning the taxi company's dispatch and arranging for a pick-up.  With the dawn of smartphones came a new way to hail a cab—through a mobile application ("app") on the phone that alerts the taxi company's dispatch of the passenger's whereabouts and coordinates the pick-up.  This is now referred to in the taxicab industry as "e-hailing."

15.  Upon information and belief, Flywheel emerged as an e-hail application provider in San Francisco in 2012.  Flywheel developed an application that is downloaded by both prospective passengers and taxicab drivers and allows the two to connect to arrange the pick-up.  As part of setting up the account, the prospective passenger enters her debit or credit card information into Flywheel's application (referred to as a "card on file").  At the end of the ride, Flywheel generates an encrypted "token," which includes the debit or credit card information and the metered fare in a format that cannot easily be deciphered, which is then electronically sent to a credit card processing service, or merchant services provider, for processing.  Flywheel charges the taxicab drivers a user fee for its services.

16.  Soon after Flywheel emerged in the market, CMT learned that Flywheel was marketing its e-hail application directly to members of its San Francisco Taxi Fleet Partners, who could download and use the application on their personal smartphones while circumventing the appropriate, mandated use of CMT Hardware during rides.

1  17. As a result, all credit and debit card transactions from passengers who "hailed" cabs using the "e-hail" application were automatically processed through Flywheel's payment processor, instead of through CMT, in violation of CMT's exclusivity agreements with the San Francisco Taxi Fleet Partners.

18. Upon discovery of Flywheel's interference on or around October 7, 2014, CMT sent Flywheel a cease and desist letter, informing Flywheel in unequivocal terms of its contractual rights and demanding that Flywheel immediately stop its interference. Specifically, CMT communicated:

> Each and every San Francisco taxi customer with CMT equipment currently installed has exclusively granted CMT the right to process electronic payments in those vehicles. Indeed, **every licensed taxi in San Francisco is required to contract with an authorized vendor exclusively and, to the extent Flywheel conducts any electronic payment transaction for fares conducted in a San Francisco taxi—in any form—it is interfering with an existing contractual relationship.**

19. Flywheel responded and represented that it wanted to work in "partnership" with CMT both with respect to San Francisco, and in the future. The parties negotiated for several weeks and on or around December 4, 2014 entered into the CMT-Flywheel Contract, in which Flywheel ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. A true and correct copy of the CMT-Flywheel Contract is attached hereto as Exhibit A.

20. This seemed to be a reasonable business solution for all: the members of the San Francisco Taxi Fleet Partners could to continue to download and use Flywheel's e-hail application, but without breaching the San Francisco Taxi Fleet Partners' agreements with CMT.

21. At the time, the Parties also discussed entering into similar agreements as Flywheel expanded its application into other markets in the country where CMT had contracts with other Taxi Fleet Partners.

## Flywheel Breaches The Agreement And Expands Its Tortious Interference

22. Despite Flywheel's repeated assurances that it wanted a productive business relationship with CMT going forward, it soon became clear during the integration process that Flywheel had a diminishing interest in ▮▮▮▮▮▮▮▮▮▮, eventually dropping from contact altogether. To date, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Flywheel's technical and management representatives have refused to engage meaningfully with CMT for over a year, despite that members of the Taxi Fleet Partners continue to use Flywheel's application, now—thanks to Flywheel—in breach of *their* contracts with CMT.

23. Each and every time Flywheel routes a debit or credit card transaction through a payment processor other than CMT in a vehicle in San Francisco equipped with CMT Hardware, it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ causes a Taxi Fleet Partner to breach its contract with CMT as well. Upon information and belief, this occurs hundreds, if not thousands, of times a day, each time costing CMT a transaction fee it is contractually entitled to receive.

24. If Flywheel's tortious behavior in San Francisco were not enough, in 2015, Flywheel set out to systematically target CMT's Taxi Fleet Partners in New York, Boston, Chicago, Philadelphia and—most recently—Houston. Flywheel did this with full knowledge that each and every taxicab in the country with CMT Hardware installed has an agreement providing that CMT is its exclusive electronic payment processor, and without making any effort to work in "partnership" with CMT with respect to electronic payment processing.

25. At the same time, Flywheel even began marketing its own in-vehicle equipment to process electronic transactions and began operating a passenger-facing, non-certified taximeter, in clear violation of the local and state taxi rules and regulations. Flywheel was apparently not satisfied in disrupting CMT's exclusive

1  payment processing rights.  It also wanted to displace CMT's highly valuable in-
2  vehicle hardware with low-quality, non-compliant technology.

3      26.    On or around September 2, 2015, CMT sent Flywheel a series of cease
4  and desist letters, once again reminding Flywheel of the existence of its contracts with
5  the Taxi Fleet Partners, of the exclusivity provisions contained therein, and of
6  Flywheel's tortious interference.  CMT sent separate letters to Flywheel identifying its
7  interference in New York, Boston, Chicago, Philadelphia, and San Francisco.  In the
8  cease and desist letter regarding CMT's tortious interference in San Francisco, CMT
9  noted the "egregious" nature of Flywheel's conduct "given CMT's prior notices to
10 Flywheel concerning identical, violative activities in San Francisco and Flywheel's
11 obligations under its ███████████ agreement with CMT."

12     27.    Flywheel ignored CMT's demands, and continued to boldly interfere
13 with these contracts, in breach of its own.

14     28.    In fact, when the SFMTA announced new regulations for the taxi
15 industry requiring the San Francisco Taxi Fleet Partners to affiliate with a compliant
16 e-hail application provider by a set deadline, Flywheel seized on this as an opportunity
17 to further disrupt CMT's contracts.  Upon information and belief, after heavily
18 lobbying the SFMTA for favorable e-hail application requirements, Flywheel held
19 itself out as the only compliant e-hail application provider in the market, and sought to
20 enlist entire fleets equipped with CMT hardware to download and use its application,
21 ████████████████████████████████████████
22 ██████.  Flywheel's behavior, shortly after receiving CMT's second round of cease
23 and desist letters, is telling.  Not only is Flywheel disregarding its contractual
24 obligations, it is increasing the very tortious interference the contract was meant to fix.

25     29.    Moreover, Flywheel shows no signs of stopping.  As recently as April
26 2016, Flywheel blasted CMT's Taxi Fleet Partner in Houston, advertising its
27 application and also announcing new, vehicle-mounted hardware designed to compete

directly with vendors like CMT. In this promotional material, Flywheel brazenly accuses "current payment and technology providers," (*i.e.*, CMT) of focusing on "restrictive covenants" and actively encourages CMT's Houston Taxi Fleet Partner to abandon "[c]urrent taxi technology," in favor of its own.

30. It is now clear that Flywheel has no intention of honoring its agreement with CMT or CMT's contracts with its Taxi Fleet Partners. Instead, Flywheel will continue to breach the CMT-Flywheel Contract, while interfering with CMT's contracts with fleets around the country, unless and until it is judicially forced to stop. CMT is losing hundreds, if not thousands, of transaction fees on a daily basis in each of the cities it serves that Flywheel has infiltrated.

31. Flywheel has acted and continues to act with the intent to cause CMT economic injury, and with a willful and conscious disregard of CMT's rights.

## **FIRST CLAIM—BREACH OF CONTRACT**

32. CMT alleges and incorporates by reference the allegations in the paragraphs above.

33. CMT and Flywheel entered into the CMT-Flywheel Contract on or around December 4, 2014. The CMT-Flywheel Contract is binding and enforceable. A true and correct copy of the CMT-Flywheel contract is attached hereto as Exhibit A.

34. CMT performed all of its obligations under the CMT-Flywheel Contract.

35. The CMT-Flywheel Contract provides that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

36. The contract ███████████████████████████████.

37. Flywheel has breached and continues to breach the CMT-Flywheel Contract by ███████████████████████████████████████████

- 9 -

COMPLAINT FOR:(1) BREACH OF CONTRACT;(2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;(3) INDUCING BREACH OF CONTRACT;(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND (5)UNFAIR COMPETITION (CAL. BUS. PROF. CODE SECTION 17200 ET SEQ.)DEMAND FOR JURY TRIAL
CASE NO.

1   █████████████████████████████████
2   ████████████████████████.

3   38.   Flywheel further breached and continues to breach the CMT-Flywheel
4   Contract by ████████████████████████████████
5   █████████████████████████████████
6   █████.

7   39.   As a result of Flywheel's breach, CMT has suffered damages in an
8   amount not yet ascertained, but well in excess of $75,000.  CMT is entitled to recover
9   damages adequate to compensate it for Flywheel's breach in an amount to be
10  determined at trial.

## SECOND CLAIM—BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

40.   CMT alleges and incorporates by reference the allegations in the paragraphs above.

41.   Flywheel and CMT were parties to the CMT-Flywheel Contract, and Flywheel owed CMT a duty of good faith and fair dealing arising therefrom.

42.   CMT performed all of its obligations under the CMT-Flywheel Contract.

43.    Flywheel breached its duty of good faith and fair dealing and denied CMT the benefit of the contract by unfairly interfering with CMT's contractual rights to process electronic payments in vehicles equipped with CMT payment systems. Not only did Flywheel breach its contractual duties to CMT, but it continued to intentionally induce members of CMT's Taxi Fleet Partners to download its application, with full knowledge of CMT's exclusive electronic payment processing rights, and then—███████████████████—consciously divert the transactions CMT was entitled to process to itself, for its own financial gain.  Since entering into

the CMT-Flywheel Contract, Flywheel has actively engaged in, and even increased, the very same tortious activity the CMT-Flywheel Contract was supposed to remedy.

44.   CMT's expectation that Flywheel would abide by the CMT-Flywheel Contract and not actively seek to deny CMT the benefits of the contract by shopping its application to CMT's Taxi Fleet Partners with no intention of honoring its contract, was reasonable and justified.

45.   As a result of Flywheel's conduct, CMT has suffered damages in an amount not yet ascertained. CMT is entitled to recover damages adequate to compensate it in an amount to be determined at trial.

## THIRD CLAIM—INDUCING BREACH OF CONTRACT

46.   CMT alleges and incorporates by reference the allegations in the paragraphs above.

47.   CMT has valid and enforceable contracts with the Taxi Fleet Partners in San Francisco, New York, Boston, Chicago, Philadelphia, and Houston which, *inter alia*, designate CMT as their exclusive debit and credit card payment processor (the "CMT-Taxi Fleet Exclusivity Contracts").

48.   Flywheel has actual knowledge of the CMT-Taxi Fleet Exclusivity Contracts because, *inter alia*, CMT has informed Flywheel repeatedly—both verbally and in writing—of the existence of these contracts and CMT's rights thereunder. Upon information and belief, CMT's Taxi Fleet Partners have also informed Flywheel of these contracts and their obligations to CMT thereunder.

49.   Flywheel, with this knowledge, intentionally targeted members of each and every one of CMT's Taxi Fleet Partners with the purpose of (i) inducing the Taxi Fleet Partners and their members to breach the CMT-Taxi Fleet Exclusivity Contracts and (ii) maliciously appropriating CMT's exclusive payment processing rights for itself, for its own financial gain.

50. Specifically, Flywheel has and continues to market directly to the Taxi Fleet Partners and their members and incentivize them to download and use the Flywheel application, including its electronic payment processing system, so that debit and credit card transactions are processed through Flywheel, rather than CMT, for a fee payable to Flywheel. Flywheel has done and continues to do this despite its knowledge that these members are contractually obligated to process electronic payment transactions exclusively through CMT.

51. As a result of Flywheel's malicious and tortious acts, CMT's contracts with its Taxi Fleet Partners have been and continue to be breached each and every time a debit or credit card transaction is routed through Flywheel's application, rather than through CMT's electronic payment processor.

52. As a direct and proximate result of Flywheel's inducing breach of the CMT-Taxi Fleet Exclusivity Contracts, CMT has suffered and continues to suffer damages in an amount not yet ascertained, but well over $75,000. CMT is entitled to recover damages adequate to compensate it for Flywheel's tortious conduct and exemplary damages in an amount to be determined at trial.

### FOURTH CLAIM—INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

53. CMT alleges and incorporates by reference the allegations in the paragraphs above.

54. CMT has valid and enforceable contracts with the Taxi Fleet Partners in San Francisco, New York, Boston, Chicago, Philadelphia, and Houston—the CMT-Taxi Fleet Exclusivity Contracts.

55. Flywheel has actual knowledge of the CMT-Taxi Fleet Exclusivity Contracts because, *inter alia*, CMT has informed Flywheel repeatedly—both verbally and in writing—of the existence of these contracts and CMT's rights thereunder.

Upon information and belief, CMT's Taxi Fleet Partners have also informed Flywheel of these contracts and their obligations to CMT thereunder.

56. Flywheel, with this knowledge, intentionally targeted members of each and every one of CMT's Taxi Fleet Partners with the purpose of (i) disrupting the CMT-Taxi Fleet Exclusivity Contracts and (ii) maliciously appropriating CMT's exclusive payment processing rights for itself, for its own financial gain.

57. Specifically, Flywheel has and continues to market directly to members of the Taxi Fleet Partners and incentivize them to download and use the Flywheel application, including its electronic payment processing system, so that debit and credit card transactions are processed through Flywheel's application, rather than CMT's, for a fee payable to Flywheel. Flywheel has done and continues to do this despite its knowledge that these members are contractually obligated to process electronic payment transactions exclusively through CMT. Flywheel, with this knowledge, also used the SFTMA e-hail application requirements to attempt to encourage the San Francisco Taxi Fleet Partners into signing contracts with Flywheel, in blatant breach of their contracts with CMT.

58. Additionally, Flywheel has begun pushing its in-vehicle technology directly to CMT's Taxi Fleet Partners, actively encouraging them to replace CMT's Hardware—a multi-million dollar investment—with Flywheel's single mobile device, also in breach of their contracts with CMT.

59. Upon information and belief, Flywheel's purpose is not only to profit by unlawfully diverting electronic payment processing fees rightfully belonging to CMT to itself, but to usurp CMT's existing, active contracts regarding CMT Hardware and completely displace it from the market.

60. As a result of Flywheel's malicious and tortious acts, CMT's contracts with its Taxi Fleet Partners have been and continue to be disrupted and breached.

61. As a direct and proximate result of Flywheel's interference with CMT's contractual relations, CMT has suffered and continues to suffer damages in an amount not yet ascertained but well in excess of $75,000, including but not limited to CMT's goodwill and existing customer relationships. CMT is entitled to recover damages adequate to compensate it for Flywheel's tortious conduct and exemplary damages in an amount to be determined at trial.

### FIFTH CLAIM— CALIFORNIA UNFAIR COMPETITION (CAL. BUS. & PROF. CODE §§17200 *ET SEQ.*)

62. CMT alleges and incorporates by reference the allegations in the paragraphs above.

63. Within four years preceding the filing of this Complaint, and at all times mentioned herein, Flywheel has engaged, and continues to engage, in unfair and unlawful trade practices in California by engaging in the unfair and unlawful business practices described in this Complaint, including the following:

   i. inducing Taxi Fleet Partners to violate existing contractual relationships with CMT with the purpose of pushing CMT out of the market;

   ii. garnering favorable treatment from the SFMTA to have regulations advantageous to Flywheel promulgated, only to use that leverage to further interfere with CMT's contracts with the San Francisco Taxi Fleet Partners; and

   iii. most recently, releasing competing in-vehicle technology and marketing that technology directly to CMT's Taxi Fleet Partners, with full knowledge that purchasing Flywheel's technology will violate CMT's contractual rights and displace it from the market.

64. The aforementioned practices, which Flywheel is using to its significant financial gain, also constitute unlawful competition and provide an unlawful

advantage over Flywheel's competitors as well as injury to the taxicab industry and the general public.

65. As a direct and proximate result of such actions, Flywheel has enjoyed, and, unless judgment is entered in CMT's favor, will continue to enjoy significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

66. CMT is entitled to and does seek a declaration that the above-described trade practices are unlawful and/or fraudulent.

67. CMT is further entitled to and does seek an injunction to prohibit Flywheel from continuing to engage in the unfair trade practices complained of herein, including an injunction prohibiting Flywheel from contracting with the Taxi Fleet Partners to provide credit card processing services and/or its in-vehicle hardware platform.

## **PRAYER FOR RELIEF**

CMT requests entry of judgment in its favor against Flywheel for the following:

a. A declaration that Flywheel has committed the violations complained of herein;
b. An injunction prohibiting Flywheel from contracting with the Taxi Fleet Partners to provide credit card processing services and/or its in-vehicle hardware;
c. An award of damages adequate to compensate CMT for its losses, together with pre- and post-judgment interest and costs, in an amount according to proof;
d. An award of punitive and/or exemplary damages;
e. An award of attorneys' fees and costs;
f. Such other costs and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff CMT requests a trial by jury.

Date:  May 11, 2016

Submitted By,

SINGER / BEA LLP

By:_____
Benjamin L. Singer
Katie K. Erno
Attorneys for Creative Mobile
Technologies, LLC