1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    CREATIVE MOBILE TECHNOLOGIES,            Case No. 16-cv-02560-SI
     LLC,

8                    Plaintiff/Counter-Defendant,

9         v.                                  ORDER GRANTING MOTION TO
                                              DISMISS SECOND AMENDED
10   FLYWHEEL SOFTWARE, INC.,                 COUNTERCLAIM

11                   Defendant/Counterclaimant.   Re: Dkt. No. 52

12

13          Plaintiff and counter-defendant Creative Mobile Technologies, LLC ("CMT") has filed a

14   motion to dismiss the second amended counterclaim of defendant and counterclaimant Flywheel

15   Software, Inc. ("Flywheel").  Dkt. No. 52.  This matter came on for hearing on February 17, 2017.

16   For the reasons stated below, the Court GRANTS CMT's motion to dismiss the second amended

17   counterclaim, with prejudice.

18

19                                   **BACKGROUND**

20          The factual background of this case is laid out more fully in the Court's October 5, 2016

21   order granting CMT's motion to dismiss Flywheel's counterclaims.  *See* Dkt. No. 38.  In its

22   complaint, CMT alleges that it designed and developed technology to allow taxicabs to process

23   credit card payments from riders.  Dkt. No. 1, Compl. ¶¶ 8-9.  CMT "then contracted with

24   numerous taxi fleets nationwide . . . to install the CMT Hardware in their taxicabs."  *Id.* ¶ 9.

25   Under the contracts, CMT would purchase and install CMT Hardware at no upfront cost to the taxi

26   fleet partners, for use by their taxicab drivers.  *Id.*  In exchange, the taxi fleet partners agreed "to

27   process all electronic passenger payments exclusively through CMT's payment processor

28   throughout the duration of the contract."  *Id.*

United States District Court
Northern District of California

1    Defendant Flywheel developed a mobile "e-hailing" application for smartphones that also

2   allows for credit card processing of taxicab rides.  *Id.* ¶¶ 14-15.  CMT alleges in its complaint that

3   Flywheel's application violates CMT's exclusivity agreements with its taxi fleet partners in San

4   Francisco.  *Id.* ¶ 17.  On or around December 4, 2014, CMT and Flywheel entered into a contract

5   that CMT now alleges Flywheel is violating by processing debit or credit card transactions from

6   riders in taxicabs that have exclusivity agreements with CMT.  *Id.* ¶¶ 19, 23.

7    CMT filed its complaint against Flywheel on May 11, 2016.  Dkt. No. 1.  On June 20,

8   2016, Flywheel answered the complaint and brought two counterclaims for unlawful restraint of

9   trade and unfair competition.  Dkt. No. 16.  On October 5, 2016, upon CMT's motion, the Court

10  dismissed Flywheel's counterclaims with leave to amend.  Dkt. No. 38.  Flywheel filed an

11  amended counterclaim on October 19, 2016, dropping its counterclaim for unlawful restraint of

12  trade but continuing to allege violations of unfair competition law.  Dkt. No. 40.  On December 6,

13  2016, the Court granted CMT's motion to dismiss the amended counterclaim, again with leave to

14  amend.  Dkt. No. 49.

15   On December 20, 2016, Flywheel filed its second amended counterclaim ("SACC")

16  against CMT.  Dkt. No. 51.  Flywheel alleges that "CMT is using the restrictive covenants in its

17  contracts with various taxi companies as a hammer to stop the cab companies from using

18  Flywheel's services" and that these contracts "are not reasonably related to the services that

19  Flywheel provides."[1]   SACC ¶ 3.  Flywheel further alleges that CMT has never shared the

20  Restraining Agreements with Flywheel.  *Id.* ¶ 8.  According to the SACC, once customers

21  download Flywheel's application onto their smart phones, they may hail taxi rides through

22  Flywheel's platform.  *Id.* ¶ 12.  The customers then pay for these rides through Flywheel's

23  platform.  *Id.*  Flywheel alleges that its platform does not interfere with CMT's business because

24  CMT does not generate taxi business but "simply processes debit and credit card transactions for

25

26   [1]  Flywheel refers to CMT's contracts with the taxi companies as "Restraining
    Agreements."   SACC ¶ 8.  CMT refers to these contracts as "CMT-Taxi Fleet Exclusivity
27  Contracts" and "Taxicab Contracts."  Compl. ¶ 47; Dkt. No. 52, Mot. at 1.  For purposes of
    deciding this motion, the Court will adopt Flywheel's terminology and refer to the contracts as
28  "Restraining Agreements."

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    rides that the Subject Taxi Companies generate on their own."  *Id.* ¶ 13.  For such rides,

2    Flywheel's platform is not used.  *Id.*

3        Flywheel continues to bring one counterclaim against CMT, for violation of California's

4    Unfair Competition Law ("UCL"), California Business and Professions Code section 17200 et

5    seq.  *Id.* at 6.  Flywheel alleges that CMT's Restraining Agreements "have had and continue to

6    have an unfair anticompetitive effect on competition."  *Id.* ¶ 15.  It alleges that these practices

7    have caused Flywheel to lose the business of approximately 1500 drivers, translating to lost annual

8    revenue of more than $3 million.  *Id.* ¶¶ 19-20.  Flywheel alleges that CMT's actions constitute

9    unfair conduct as defined by the California Supreme Court in *Cel-Tech Communications v. Los*

10   *Angeles Cellular Telephone Company*, 20 Cal. 4th 163 (1999).  *Id.* ¶ 23.

11       CMT now moves to dismiss the second amended counterclaim with prejudice under

12   Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 52.

13

14                                **LEGAL STANDARD**

15       To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to

16   state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

17   (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to

18   "more than a sheer possibility that a Defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S.

19   662, 678 (2009).  While courts do not require "heightened fact pleading of specifics," a plaintiff

20   must allege facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550

21   U.S. at 555, 570.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

22   elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

23   555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

24   enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  "While legal conclusions can provide

25   the framework of a complaint, they must be supported by factual allegations."  *Id.* at 679.

26       In reviewing a Rule 12(b)(6) motion to dismiss a counterclaim, a district court must accept

27   as true all facts alleged in the counterclaim, and draw all reasonable inferences in favor of the

28   claimant.  *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).  However, a district court is

not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

CMT challenges Flywheel's second amended counterclaim on several grounds. CMT argues that Flywheel lacks standing under the UCL. Mot. at 13-14. CMT also argues that Flywheel cannot allege unfairness under the UCL, asserting (1) that the Restraining Agreements are protected by California law and therefore cannot form the basis of a UCL claim, and (2) that CMT's conduct is not unfair as defined by the California Supreme Court in *Cel-Tech*. *Id.* at 6-11.

## I.      Standing under the UCL

Since the passage of Proposition 64 in 2004, private plaintiffs wishing to sue under the UCL must demonstrate that they have "suffered injury in fact and [have] lost money or property as a result of the unfair competition." *See* Cal. Bus. & Prof. Code § 17204. The California Supreme Court has explained, "If a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 325 (2011).

In its second amended counterclaim, Flywheel now alleges that if not for the Restraining Agreements "an additional 1500 drivers would be using Flywheel's application today." SACC ¶ 19. Flywheel goes on to allege that, "[a]s a direct consequence of CMT's business practices, Flywheel has lost substantial business opportunities in California and elsewhere. The loss of 1500 drivers translates to lost annual revenue of more than $3 million." *Id.* ¶ 20. CMT argues that

4

United States District Court
Northern District of California

1    these allegations do not suffice because "Flywheel fails to provide any support whatsoever for its

2    'estimate'" and because Flywheel "alleges no facts to tie the allegedly wrongful conduct to the

3    alleged loss." Mot. at 13-14.

4          The Court disagrees with CMT and finds that Flywheel's allegations suffice to meet the

5    UCL's standing requirement at this stage.  The case on which CMT relies for its assertion that

6    Flywheel must prove, rather than simply allege, economic injury was decided on summary

7    judgment.  *See* Mot. at 13-14 (citing *Johnstech Int'l Corp. v. JF Microtech. SDN BHD*, No. 14-cv-

8    2864-JD, 2016 WL 4182402 (N.D. Cal. Aug. 8, 2016)).  That case is therefore not instructive on

9    what suffices at the pleading stage.  Flywheel's allegations in the SACC go beyond the allegations

10   that the Court previously found to be conclusory as to standing.  *See* Dkt. Nos. 38 at 9, 49 at 5.

11   Flywheel has now alleged "individualized loss of money . . . in [a] nontrivial amount," which

12   means it has also properly alleged injury in fact under the UCL.  *See Kwikset*, 51 Cal. 4th at 325.

13   Nor does accepting Flywheel's allegation that these losses stemmed from CMT's challenged

14   conduct require the Court to make any "unwarranted deductions of fact[] or unreasonable

15   inferences."  *See Gilead*, 536 F.3d at 1055.  For these reasons, the Court will not dismiss

16   Flywheel's counterclaim on standing grounds.

17

18   **II.    Unfair Business Act or Practice under the UCL**

19         The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair,

20   deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  Accordingly,

21   "[a]n act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or

22   fraudulent."  *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007).

23         As this Court has previously observed, where a competitor brings an action under the

24   unfair prong of the UCL claiming anticompetitive practices, the California Supreme Court's

25   decision in *Cel-Tech* governs.  *See* Dkt. Nos. 38 at 8, 49 at 3; *Cel-Tech*, 20 Cal. 4th at 187 n.12.

26   Courts apply a two-step process to determine whether conduct constitutes an unfair business act or

27   practice.  *Cel-Tech*, 20 Cal. 4th at 187.  First, the court must determine if the Legislature has

28   provided a safe harbor for the challenged conduct.  *Id.*  "If the Legislature has permitted certain

conduct or considered a situation and concluded that no action should lie, courts may not override that determination." *Id.* at 182.  Second, "[i]f no statute provides a safe harbor, a court must determine whether the challenged conduct is unfair within the meaning of the unfair competition law." *Id.* at 184.  The California Supreme Court has defined "unfair" thus:

> [T]o guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Id.* at 186-87.

Flywheel brings its second amended counterclaim under the "unfair" prong of the UCL. SACC at 6; Dkt. No. 58, Oppo. at 9.  It alleges unfair competition based on two types of conduct: (1) the entering into of the Restraining Agreements, and (2) coercion of the taxi companies to refuse to deal with Flywheel based on those Restraining Agreements.  SACC ¶ 25.  CMT moves to dismiss the counterclaim, arguing that the Restraining Agreements are protected under California law and that Flywheel has failed to allege an unfair act or practice as defined in *Cel-Tech*.  Mot. at 6-11.

### A.  Safe Harbor for the Restraining Agreements

CMT argues that the legislature has provided a safe harbor for its conduct, citing to California Business and Professions Code section 16725 and arguing that Flywheel cannot allege market power.  Mot. at 6-7.  Section 16725 provides, "It is not unlawful to enter into agreements or form associations or combinations, the purpose and effect of which is to promote, encourage or increase competition in any trade or industry, or which are in furtherance of trade."  Cal. Bus. & Prof. Code § 16725.  CMT argues that "if a restraint on trade is reasonable under the jurisprudence governing the Sherman and Cartwright Acts,[] that restraint is 'in furtherance of trade' and explicitly permitted by the safe harbor of Section 16725."  Mot. at 7 (citing *In re Cipro Cases I & II*, 61 Cal. 4th 116, 137 n.5 (2015)).  CMT argues by extension that the Restraining Agreements

United States District Court
Northern District of California

are permitted under section 16725 and so cannot serve as the basis for a UCL claim.  *Id.* at 9.

In *Cel-Tech*, the California Supreme Court differentiated between conduct that the law expressly permits and conduct that the law does not prohibit.  The court explained, "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct.  There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful."  *Cel-Tech*, 20 Cal. 4th at 183.  Regarding section 16725, the California Supreme Court recently noted that antitrust violations under the California Cartwright Act "are subject to an implied exception similar to the one that validates reasonable restraints of trade under the federal Sherman Antitrust Act."  *Cipro*, 61 Cal. 4th at 137.  Section 16725 of the Cartwright Act codifies this principle.  *Id.* at 137 n.5.

California law is thus not quite as CMT presents it, in arguing that section 16725 "explicitly permits" every restraint on trade that is reasonable under the Cartwright Act.  *See* Mot. at 7.  Taking this one step further, section 16725, by its very language, does not "bar" an action of the type at issue here nor does it "clearly permit" restraining agreements.  *See Cel-Tech*, 20 Cal. 4th at 183; *see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1164-67 (9th Cir. 2012) (applying *Cel-Tech* and finding safe harbor applied to disclosure of an annual fee in an online credit card application, where the disclosure complied with federal law mandating such disclosure, but finding no safe harbor in advertisement that failed to disclose the annual fee, where no statute or regulation "affirmatively permits" companies to omit such a disclosure).  Because no safe harbor protects CMT's Restraining Agreements from attacks under the UCL's "unfair" prong, the Court will proceed to the question of whether Flywheel has sufficiently alleged that CMT's conduct is unfair under *Cel-Tech*.  *See Cel-Tech*, 20 Cal. 4th at 184, 187.

### B.      Unfairness under *Cel-Tech*

Flywheel's second amended counterclaim identifies two practices that it claims are unfair under the UCL: (1) CMT's entering into Restraining Agreements with taxi companies, and (2) CMT's coercing the taxi companies "to refuse to deal with Flywheel based on the Restraining Agreements."  SACC ¶ 25.  At this second step of the analysis, the Court considers whether

Flywheel has alleged "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. The Court finds that Flywheel has failed to make the required allegations, and the Court will accordingly dismiss Flywheel's SACC with prejudice.

As this Court has previously observed, the *Cel-Tech* court did not reach the question of whether the challenged conduct was unfair. *See* Dkt. No. 49 at 5. Rather, the court stated in dicta that the plaintiffs may be able to state a UCL claim because the "case has an unusual circumstance . . . : [defendant's] position as a wholesale duopolist." *Cel-Tech*, 20 Cal. 4th at 189; *see also Synopsys, Inc. v. ATopTech, Inc.*, No. 13-2965-MMC, 2015 WL 4719048, at *10 (N.D. Cal. Aug. 7, 2015) (explaining that *Cel-Tech* was "unusual," in that the defendant accused of selling cellular telephones below cost was "one of two holders of a lucrative government-licensed duopoly that enabled [the defendant] to subsidize massive losses . . . with . . . profits which by law were unavailable to its competitors").

Although *Cel-Tech* was decided post-trial, numerous courts since then have applied *Cel-Tech* in finding that complaints have failed to state a claim for unfair competition. In *Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014), the Ninth Circuit affirmed the dismissal of a claim that business owners brought under the unfair prong of the UCL. The plaintiffs alleged that "Yelp created negative reviews of their businesses and manipulated review and ratings content to induce them to purchase advertising through Yelp." *Levitt*, 765 F.3d at 1127. The court found that the general allegation that Yelp's conduct "harms competition by favoring businesses that submit to Yelp's manipulative conduct and purchase advertising to the detriment of competing businesses that decline to purchase advertising" did not suffice to allege what "amounts to a violation of antitrust laws" or conduct that "otherwise significantly threatens or harms competition." *Id.* at 1136-37 (citing *Cel-Tech*, 20 Cal. 4th at 187).[2]

---

[2] Flywheel argues that *Levitt* is not a competition case and so is inapplicable here. Oppo. at 11. The Ninth Circuit, however, described the *Cel-Tech* standard as one applicable to "business-competitor cases" and found that it was appropriate to use in *Levitt* because "the crux of the business owners' complaint is that Yelp's conduct unfairly injures their economic interests to the

United States District Court
Northern District of California

Similarly, in *Parrish v. National Football League Players Association*, 534 F. Supp. 2d 1081 (N.D. Cal. 2007), the district court dismissed a claim under the unfair prong of the UCL. The plaintiffs, retired football players, alleged that the defendants entered into exclusive dealing arrangements with licensees for the rights to images of current and former NFL players. *Parrish*, 534 F.3d at 1092. They rested their claim on defendants' entering "into exclusive deals with licensees, thereby foreclosing their opportunities to enter into direct licenses." *Id.* Because exclusive deals "are not *per se* illegal[,]" the court found that "[t]he mere existence of an exclusive deal between the [defendant] and its licensees does not violate the antitrust laws or significantly threaten competition." *Id.* Moreover, plaintiffs had failed to allege an incipient violation of antitrust law where the complaint cited only to "popular press articles" predicting that the licenses at issue would decrease consumer choice in video games. *Id.* at 1093.

Here, the Court finds that Flywheel has failed to allege an incipient violation of antitrust law or conduct that violates "the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law." *See Cel-Tech*, 20 Cal. 4th at 187. The Court previously ruled that Flywheel had failed to allege a violation of antitrust law to the extent that its antitrust claim centered on CMT's Restraining Agreements. Docket No. 38 at 6. This ruling is presumably what led Flywheel to abandon its counterclaim for unlawful restraint of trade. As in *Synopsys*, where the court dismissed the UCL claim, Flywheel "has not pointed to any 'unusual' aspect of the alleged conduct that would make that conduct something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves. Rather, the conduct [Flywheel] challenges either is anticompetitive and thus simultaneously violates both the antitrust laws and their 'policy and spirit,' or it violates neither." *See Synopsys*, 2015 WL 4719048, at *10.

Nor has Flywheel alleged conduct that significantly threatens or harms competition. *See Parrish*, 534 F. Supp. 2d at 1093. Although Flywheel has alleged that CMT has coerced the taxi companies not to deal with Flywheel, the SACC contains no allegations indicating coercion outside of the mere fact that CMT and the taxi companies have entered into the Restraining

benefit of other businesses who choose to advertise with Yelp." *Levitt*, 765 F.3d at 1136.

Agreements.  *See* SACC ¶ 25.  The Court previously found that Flywheel's allegations regarding coercion lacked the "further factual enhancement" needed to make the counterclaim more than simply conclusory.  *See* Dkt. No. 49 at 4 (citing *Twombly*, 550 U.S. at 557).  This continues to be the case.  The new allegation that "CMT is continuing to refuse to produce the Restraining Agreements" does not, as Flywheel asserts, constitute "fair evidence of coercion."  *See* SACC ¶ 19.  Flywheel also asserts that CMT "has threatened and coerced" the taxi companies not to do business with Flywheel, but the only supporting allegation is the statement that the taxi companies "would engage in business with Flywheel but for CMT's restrictive covenants."  *See id.*  None of these allegations describe conduct that "amounts to a violation of antitrust laws" or that "otherwise significantly threatens or harms competition."  *See Levitt*, 765 F.3d at 1136-37 (citing *Cel-Tech*, 20 Cal. 4th at 187).

At the hearing, Flywheel repeatedly argued that the Restraining Agreements are unfair because CMT's business is not reasonably related to Flywheel's services.  *See* SACC ¶¶ 3, 13.  Flywheel argued for the first time at the hearing that the Ninth Circuit's decision in *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (2008) supports its allegations of unfairness.  The Court addressed that case extensively in its prior order dismissing Flywheel's antitrust claim with leave to amend.  *See* Dkt. No. 38 at 5-6.  The plaintiff in *Newcal* did not raise a claim under the UCL, and upon further examination the Court does not find that *Newcal* supports Flywheel's UCL claim here.  That case involved a company that was "exploiting its unique position—its unique contractual relationship—to gain monopoly power in a derivative aftermarket in which its power [was] not contractually mandated."  *Newcal*, 513 F.3d at 1050.  Here, however, the provisions of the contract themselves are the source of the market power, as Flywheel alleges it.  The allegations in the complaint, which Flywheel incorporates into the SACC, state that under the Restraining Agreements the taxi companies agreed "to process all electronic passenger payments exclusively through CMT's payment processor throughout the duration of the contract."  Compl. ¶ 9.  Flywheel has alleged that credit and debit payments are processed through its application when a customer uses the Flywheel application to hail a taxicab.  SACC ¶ 12.  Thus, the argument that the Restraining Agreements restrict conduct that is not reasonably related to Flywheel's

business is simply not plausible, as Flywheel has alleged it.  Flywheel has made no argument that CMT is exploiting its contractual relationship with the taxi companies; rather, Flywheel argues that the Restraining Agreements themselves are simply unfair.  Flywheel does not argue that CMT has been able to exploit its contractual relationship with the taxicab companies to monopolize a derivative aftermarket.  *See Newcal*, 513 F.3d at 1050.  Finally, Flywheel does not and has never alleged that the taxi companies were coerced to enter into these agreements in the first place.  It is again worth noting that Flywheel was given leave to amend its antitrust counterclaim and did not do so.  *See* Dkt. No. 38 at 6.

This is Flywheel's third attempt to bring a counterclaim for an unfair business act or practice that centers on CMT's Restraining Agreements with taxi companies.  The allegations do not state a claim under the test laid out in *Cel-Tech*, nor did Flywheel offer any argument at the hearing to indicate that another round of amendments would change this result.  At the hearing, Flywheel argued that its claims should not be dismissed for a lack of proof at this stage.  The Court is not dismissing the claims for Flywheel's failure to *prove* any of its allegations but because it finds that Flywheel has at this point failed three times to make the allegations necessary to support its counterclaim.  The Court therefore will dismiss Flywheel's second amended counterclaim with prejudice.  Because it is granting CMT's motion to dismiss, the Court need not reach CMT's argument regarding Flywheel's request for disgorgement and attorneys' fees and costs under the UCL.  *See* Mot. at 12.[3]

---

[3] CMT's motion includes a host of additional arguments that are improper for consideration upon a motion to dismiss.  Included among these are arguments related to Flywheel's business practices and what are clearly factual disputes regarding the contract that CMT and Flywheel entered into in December 2014.  To support these arguments, CMT has filed a request for judicial notice, attaching various news articles and website print-outs.  Dkt. No. 60.  Courts may take judicial notice of a fact "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Flywheel has not taken a position on CMT's request.  Nevertheless, the Court finds that these documents are not appropriate for judicial notice.  CMT apparently wishes the Court to take judicial notice of the truth of the content of these sources, but the facts contained therein are not generally known and cannot be accurately and readily determined.  *See id.*  Accordingly, the request for judicial notice is DENIED.  In any event, the Court need not rely on these documents in making today's ruling.

United States District Court
Northern District of California

1

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS CMT's motion to dismiss Flywheel's second amended counterclaim, with prejudice.

**IT IS SO ORDERED**.

Dated:  February 21, 2017

_____
SUSAN ILLSTON
United States District Judge